PRESTON v. ROSS et ux.

No. 33253. June 7, 1949.

*207 P. 2d 297.*

L. D. Hoyt and Leon C. Phillips, both of Oklahoma City, for plaintiff in error.

Hall & Cotten, of Oklahoma City, for defendants in error.

ARNOLD, V. C. J. Action by R. S. Ross and C. M. Ross, husband and wife, against W. A. Preston to establish a trust in real property and for an accounting of rents and profits. Judgment for plaintiffs, and defendant appeals.

The essential substance of the allegations are that in July, 1942, plaintiffs and defendant entered into an oral agreement to acquire jointly, if the price was right, title to 160 acres of land in Logan county, Okla., described as the southeast quarter of section 23, township 17 north, range 4 west, referred, to by the parties as the Stiles Farm; that it was agreed between the parties that plaintiffs should furnish the expense money required in any negotiations leading to the purchase and that defendant should conduct the negotiations, and if the purchase were made the purchase price should be borne equally by plaintiffs and defendant, plaintiffs to have an undivided one-half interest and defendant the remaining one-half interest; that in pursuance of this agreement plaintiffs furnished to defendant from time to time, when requested, cash and checks in excess of $400 to be applied on defendant's expenses in conducting the negotiations, and in clearing title to the land; that it was thereafter ascertained that the fee simple to this land could be acquired for $6,000; that circumstances in reference to the ownership of the land developed which caused long delays in clearing the title and obtaining a conveyance thereof; that in May, 1944, defendant, by telephone, advised plaintiffs that he could only obtain 80 acres of the royalty and that the same would cost $50 per acre, and requested plaintiffs to send him a cashier's check for $2,000 if they wanted their half of this 80 acres royalty; that having confidence in the defendant and relying upon these statements made by him, plaintiffs advised defendant that they would want their share of the royalty and on the same day sent him a' cashier's check for $2,000 which he endorsed and cashed, and thereafter, on May 29, 1944, executed and delivered to plaintiffs a mineral deed to 40 acres of royalty under this 160 acres; that in truth and in fact defendant had already acquired the full legal title to the 160 acres when he made this representation to plaintiffs and that the same was made wrongfully and fraudulently for the purpose of misleading and deceiving plaintiffs as to the extent of their interest in the property so acquired; that when plaintiffs learned the true facts they made demand upon defendant for a conveyance to them of an

undivided one-half interest in the 160 acres as originally agreed upon between the parties, but that defendant has failed and refused to make the conveyance; that defendant has sold various royalty interests in said 160 acres of land to various persons, receiving large sums of money therefor, and that plaintiffs are entitled to have a trust established in their favor for an undivided one-half interest in said 160 acres and for an accounting by defendant of the monies, rents, and profits received by him from said land since he acquired title thereto and for an accounting of the proceeds of the sales of royalty thereunder made by him to other persons.

Defendant answered by general denial and specifically denied any oral agreement between the parties for the joint purchase of the property by them and pleaded the statute of frauds and the statute of limitations in bar of plaintiffs' action.

For reversal of the judgment defendant relies upon three propositions thus stated in his brief:

"(I) Plaintiffs cannot recover on the theory that this was a constructive trust because such trusts do not arise by agreement;

"(II) Plaintiffs cannot recover on the theory that this was a resulting trust because they paid no part of the consideration;

"(III) Plaintiffs cannot recover on the theory that this was an express trust because (1) An agreement creating an express trust must be in writing under the Statute of Frauds; (2) The agreement did not contemplate an express trust as the title was to be taken in the names of plaintiffs and defendant, and not in the name of defendant; so that no trust was contemplated."

By way of counterproposition plaintiffs rely upon the following statement:

"The evidence conclusively establishes an equitable trust, ordinarily called an implied trust, a trust imposed upon the unwilling title holder by operation of the law, and which we believe, under this evidence, to be a constructive trust."

In cases of purely equitable cognizance dependent primarily upon the facts and circumstances in evidence, the findings and judgment of the trial court will not ordinarily be disturbed by this court unless clearly against the weight of the evidence. The case at bar is such a case.

Another rule announced and consistently adhered to by this court is that equity having once attached in a proper proceeding will administer complete relief on all questions properly raised by the evidence, regardless of whether or not such questions or issues are specifically raised by the pleadings.

It appears from the testimony preserved in this record that the transactions between the parties involved in the instant case are merely one group of transactions similar to numerous others between the same parties extending over a number of years, beginning in 1942 or prior thereto. The other transactions are identified by defendant in his testimony as the "Wild-Cat Deal", the "McKenzie Deal", the "Williams Deal", and the "Gamble Deal": These are mentioned here because the defendant while testifying stated that none of the transactions between these parties in these various deals were evidenced by written contracts or agreements but were always oral. This removes any idea that the transaction involved in the instant case, which is the "Stiles Farm Deal", was unusual in the fact that no written contract or agreement was entered into by or between the parties as to the "Stiles Farm Deal", but that the relations of the parties in this instance were the same as those which existed between them in reference to all the other transactions named by the defendant.

R. S. Ross and C. M. Ross are husband and wife, and in 1942 Mrs. Ross accompanied the defendant and his wife on a trip through the oil fields in the

western part of Logan county, and on this trip, according to her testimony, they learned that 160 acres, known as the Stiles Farm, was not under lease and Mrs. Ross suggested to Preston that they should purchase this 160 acres if the price was right. Subsequently it was learned that the title to this 160 acres was vested in a Mrs. Stiles living in Wichita, Kan., and a telegram was sent to her by the defendant asking if the property was for sale and the price. Subsequent to sending this telegram, defendant was at the home of the plaintiff in Oklahoma City when he received a long distance call from Harry Stiles, the son of the record owner, and in that conversation was advised that a clear title to the property could be had for the sum of $6,000. There is no dispute in the evidence as to this telephone conversation having taken place at the home of plaintiffs, nor as to the information received by the defendant in that telephone conversation as to the property being for sale and the price thereof. The testimony of plaintiffs is to the effect that defendant at the time informed them of the results of that telephone conversation and that it was then mutually agreed between the parties that they should buy the Stiles Farm jointly, the defendant conducting the necessary negotiations and the expenses incident thereto to be paid by plaintiffs. This agreement between the parties at that time is denied by defendant. Plaintiffs thereafter, during the progress of the negotiations leading to the purchase of the Stiles Farm, at various times and at the request of the defendant, advanced to him by checks and cash sums in excess of $400 to cover the expenses of paying delinquent taxes on the farm, removing certain clouds from the title, paying certain abstract fees, all of which items of expense were paid in response to requests of the defendant therefor. Delays incident to clearing the title to the land extended up to 1944. In April of that year defendant and the plaintiffs were together at the home of C. A. McKenzie near Stillwater. This Mr. McKenzie was the owner of the lands involved in what defendant termed the "McKenzie Deal" between plaintiffs and defendant. The plaintiffs and C. A. McKenzie all testified that at this time and place the closing of the purchase of the Stiles Farm was discussed, and that one of the plaintiffs asked defendant, "How are you going to take the deed?" that the defendant answered, "Jointly, is that satisfactory?" and that Dr. Ross answered, "Yes." This conversation is likewise denied by defendant although he was admittedly present at the McKenzie home at the time mentioned by the other witnesses. Thereafter the purchase of the Stiles Farm was consummated and defendant took title thereto in his own name. Soon thereafter he called Dr. Ross, one of the plaintiffs, by telephone and advised him that he had been unable to close the deal for the 160 acres, but had acquired an 80-acre royalty interest therein at a price of $50 per acre, and advised plaintiff that if he still desired his share in the property to send him $2,000 for a 40-acre royalty interest. This was done by plaintiff in reliance upon the representations made by defendant and it was not until some time later that plaintiffs learned of the true facts in reference to the purchase of the Stiles Farm. This action resulted.

Details of the evidence took a wide range on the trial of the case and embraced many matters which related to the other deals between these parties, but in essential substance the defense to plaintiffs' cause of action is defendant's categorical denial of each material fact testified to by plaintiffs and their witnesses. He characterized as untrue the testimony of R. S. Ross, Mrs. Ross, Mrs. Mildred Sykes, and H. A. Kroeger as to conversations which occurred and agreements made between the parties at the home of plaintiffs, and likewise as untrue the testimony of R. S. Ross, Mrs. Ross, and C. A. McKenzie, as to conversations had between

the parties in reference to the Stiles Farm Deal in April, 1944, at McKenzie's home. These denials by defendant evidently did not impress the trial judge nor do they impress us in view of the admissions made by defendant in various letters to the plaintiffs concerning the Stiles Farm Deal and the intrinsic evidence furnished by various checks from plaintiffs to defendant during pendency of the Stiles Farm Deal which were introduced in evidence. Defendant testified that in 1942 the Rosses had no interest with him in anything except the Wild-Cat Leases, yet during that year he wrote a letter in October to the plaintiffs in which he stated:

"The financial strain has been terrific, and if at all possible wire me $50.00 as I have a couple of additional items on the Stiles deal to clear up with the Loan Company."

On September 4, 1943, he wrote to plaintiffs in which he stated:

"The Stiles deal has certainly been a headache. We went to Wichita to pay off for the land, and found that the signatures of his mother on the contracts were forgeries by Harry Stiles and his wife. However, he is the only heir and his mother is bed-ridden with a broken hip and insane. She is also over 80 years old. I have filed a caviat affidavit in Guthrie so he can't transfer the title. When his mother dies he will automatically inherit the half interest of his mother, and then we can hold his feet to the fire for using the mails to defraud and also prosecute him in Kansas for forgery. I look for his mother to pass away most any time. I shall keep you advised of developments."

That the purchase of the Stiles Farm was a profitable deal is disclosed by the fact that after taking title in May, 1944, defendant sold various royalty interests during June and July of that year to persons other than plaintiffs for a total of $19,000.

The trial court found that all of the material allegations of the petition of plaintiffs were sustained by the evidence and adjudged that the plaintiffs were the owners of an undivided one-half interest in and to the real estate involved, the title to which stood in the name of the defendant, and the court transferred and conveyed said one-half undivided interest to and vested same in the plaintiffs. The court also adjudged and decreed that the defendant should file a full, true and complete statement of all rents, royalties, revenues and receipts, income and profits, received by the defendant from said land by sale or otherwise.

Under the evidence and findings of the trial court the defendant occupied fiduciary and confidential relationship with plaintiffs. By entering into the oral agreement with plaintiffs the defendant impliedly, if not expressly, agreed that he would not thereafter undertake to purchase the land involved in this controversy to the exclusion of the plaintiffs. Plaintiffs had a right to rely upon such agreement, and from the evidence in the record it appears they did rely thereon. Under the existing circumstances, as found by the court, it was the duty of the defendant to refrain from any attempt to purchase the entire property for himself, at least, until he was released from such obligation. In American Jurisprudence, vol. 54, Trusts, Sec. 228, the rule is stated as follows:

"The general rule is that a purchase, upon his own account or for his own benefit, by a fiduciary or confidant, of the property constituting the subject matter of the confidence or fiduciary relationship, in violation of the trust or confidence reposed in him, raises a constructive trust in favor of his principle or confider. The rule is not confined to a particular class of persons, such as guardians, trustees, or solicitors, but is a rule of universal application to all persons coming within its principle. The principle of the rule is that no party can be permitted to purchase an interest where he has a duty to perform which is inconsistent with the character of a purchaser."

To the same effect see Harrison et al. v. Murphey, 39 Okla. 548, 135 P. 1137.

1 Perry on Trusts and Trustees (7th Ed.) 358, states the rule applicable as follows:

"Whenever one person is placed in a relation to another, by the act and consent of that other, or the act of a third person, or of the law, so that he becomes interested for him or with him in any subject of property or business, he will in equity be prohibited from acquiring rights in that subject antagonistic to the person with whose interest he has been associated."

By his own voluntary act the defendant became interested with plaintiffs in the purchase of the property and had a duty to perform inconsistent with the purchase of the property for himself to the exclusion of the plaintiffs. See Pomeroy's Equity Jurisprudence (4th Ed.) vol. 3, section 1052.

Where one occupying a fiduciary and confidential relationship with another, takes title to property in his own name in violation of his implied or express agreement not to do so, equity will carry out its theory of double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who in good conscience is entitled to all or a portion of the title and require an accounting for all rents and profits therefrom of every kind and character.

Affirmed.

DAVISON, C.J., and WELCH, CORN, GIBSON, LUTTRELL, HALLEY, JOHNSON, and O'NEAL, JJ., concur.